## Armstrong's Administrator v. Shannon, et al.

(Decided November 2, 1917.)

### Appeal from Muhlenberg Circuit Court.

1. Executors and Administrators—Allowance and Payment of Claims —Services.—In an action to recover for nursing and attention rendered to an aged relative while residing in the family of the claimant, an express contract or agreement must be alleged and proven. An implied contract is not sufficient to support such a claim.

2. Executors and Administrators—Allowance and Payment of Claims. —The rule is, that where relatives live together in the same family the presumption will be indulged that they do so live by mutual consent for the convenience of each other, and that each receives some benefit from the arrangement.

3. Executors and Administrators—Allowance and Payment of Claims —Services.—In an action by one against the estate of a deceased relative to recover for services rendered, proof of mere statements or declarations by the deceased of future intention or desire with reference to paying for services received, are not sufficient to support an allegation that an express contract existed between the parties that such services should be paid for.

BELCHER & BELCHER and W. J. COX for appellant.

TAYLOR, EAVES & SPARKS for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

This action was instituted in the Muhlenberg circuit court by W. L. Shannon and wife against the administrator of the estate of W. A. Armstrong, for the sum of ten thousand ($10,000.00) dollars, with interest, as compensation for nursing and caring for W. A. Armstrong and wife, Princess Armstrong, during their lifetime. Mr. and Mrs. Armstrong were two old people living in Muh-.

lenberg county, who owned property, both personal and real, valued at about ten thousand ($10,000.00) dollars. Mr. and Mrs. Shannon are younger people, Mrs. Shannon having been partly reared in the home of the Armstrongs, she being a niece of Mrs. Armstrong.

Appellees, who were plaintiffs below, allege in their petition that in 1903 Mr. and Mrs. Armstrong proposed to come and live with them (Shannons), and agreed and promised in consideration of care and attention, to give to Shannons all the property which they should own at their death. This proposition, Shannons allege, they accepted, and that the Armstrongs came to live with them. About this time, however, the evidence discloses that Shannon deeded to Armstrong a one-half undivided interest in the farm on which Shannon lived, for the consideration of three hundred fifty ($350.00) dollars, which was paid by Armstrong. It was further shown that the houses on the farm were in bad repair and that Armstrong provided the money with which to build a new home, while Shannon boarded the workmen engaged in the task. After the new house was erected both families lived in it, using the same kitchen and same dining room, and each provided his own food and did his own cooking up to the time of the death of Mrs. Armstrong, which occurred in 1912. After that Mr. Armstrong continued to live in the home and to take his meals with the Shannons, but furnished provisions for the table. He died in 1915. After the appointment and qualification of the administrator of his estate, the plaintiffs filed their properly proven claim against Armstrong's estate for ten thousand ($10,000.00) dollars, for nursing and attention. This the administrator declined to pay and this suit resulted.

It is not contended that there was a written contract whereby the Armstrongs agreed to pay Shannons for care and attention. But it is asserted that there was such a verbal agreement, and this Shannons undertook to establish chiefly by the evidence of their daughter, Mrs. Clint Coleman. Upon this subject she states:

"I heard him (Mr. Armstrong) say that at his death he intended for my mother and father to have all they had. I heard him say that at Aunt Prince's death he intended for my mother and father to have all he had for taking care of them.

"Q. Where did that conversation occur and who was present? A. Well, it was at our old home; he was sitting in the family room and I was setting down there by

him, and my father was present and my mother.  Q. Was that before they moved into the house with your father and mother?  A. Yes, before.  Q. What, if anything, did your father and mother agree to do?  A. Well, they agreed to take care of him until he died for what he had.  Q. About how old were you at the time, Mrs. Coleman?  A. Ten years old.''

Several other witnesses, including the brother of Shannon, stated that on different occasions Mr. Armstrong in talking of the Shannons spoke kindly of them, and said that he wanted them to have his property at his death, and that he expected to give it to them, and other like expressions.  No one, however, testifies to an agreement or contract on the part of the Armstrongs to pay Shannons for nursing or attention, unless the statements of Mrs. Coleman, above quoted, amount to that.

The court instructed the jury that if they should believe from the evidence that Mr. and Mrs. Shannon performed the services described in the pleadings for Mr. and Mrs. Armstrong, under the contract or agreement that Mr. Armstrong would give them for such services all the property that he might own at his death, and that the Armstrongs failed to make any will or execute any conveyance of said property to the Shannons, and that the services performed by the Shannons for the Armstrongs, if any, were performed by them with the expectation on their part of being paid therefor, and that Armstrong expected and contemplated remunerating Shannons for such services, then the jury should find for the Shannons such a sum as would reasonably and fairly compensate the Shannons for the services and labor performed by them, not to exceed the value of the estate of W. A. Armstrong at his death, or the sum of ten thousand ($10,000.00) dollars, the amount claimed in the petition.  The jury was also told that unless they believed such express contract had been entered into then their verdict should be for Armstrong's administrator.  In other words, the whole case was based upon the contract relation of the parties.  The instructions appear fairly to submit the one question involved.  Upon this point the evidence is practically one way.  No specific contract is proven, and in fact the only evidence upon this subject is that of the daughter, Mrs. Clint Coleman, set forth above.  This relates to statements of intention or purpose of Armstrong to give or settle his property upon

his niece and nephew, and not a contract or undertaking enforceable in law. This of itself does not establish a contract relation. On the other hand, the parties all lived together as one family in the house built by both. They were so related in blood as to raise the presumption, in the absence of a contrary showing, that they lived together by mutual consent for the convenience and advantage of all, each in some measure dependent upon the other. While the Armstrongs, no doubt, intended to provide for the Shannons out of the estate left by them, this they neglected to do.

Perhaps Mr. Armstrong intended to make a will devising his property to his niece and nephew. However that may be, no such instrument was executed, and the courts are without power to make one for him. To recover in a case like this, the claimant must show an express agreement and promise to pay; an implied promise will not support such a claim. The rule is well stated in the case of Bolling v. Bolling's Admr., 146 Ky. 316, where it is said:

"In a long line of decisions, this court has held that where the relationship of the parties was sufficient to raise the presumption that they lived together as a matter of mutual convenience, the law will not imply a promise to pay for the services so rendered. On the contrary an express contract must be proven, and to establish such a contract, stricter proof is required than in a case of an ordinary contract."

While this rule has generally been applied in cases between parent and child, brother and sister, it has also been extended to uncles and aunts on the one side, and nephews and nieces on the other. Wier v. Wier's Admr., 3 B. M. 645; Bolling, et al., v. Bolling's Admr., 146 Ky. 316; Ballard v. Ballard, 177 Ky. 260.

The verdict for five thousand ($5,000.00) dollars is out of all proportion to the amount of services performed. The only evidence upon the value of services introduced conduced to show that while the old gentleman was sick the attentions given were reasonably worth somewhat less than twenty-five ($25.00) dollars per week. Or, in other words, the services of a trained nurse, under such circumstances, would have been worth that amount. He only required such attention for a few months at most; and if paid the wages of a trained nurse the amount would be inconsiderable compared with the verdict. One witness for appellees testified that Mr. Arm-

strong stated he intended to pay Cordie Shannon five ($5.00) dollars per month for her services. What amount he did actually pay her before his death is unknown, although some payments were made. Whether he paid her fully at that rate the court is unable to determine from the evidence. However this may be, if plaintiffs recover at all, they must do so upon competent evidence, showing the existence of an express contract or agreement to furnish the services to Armstrong and his wife and a corresponding promise and agreement on the part of Armstrong to pay therefor, otherwise their cause must fail.

Upon another trial if the evidence for plaintiff is in substance the same as upon the last trial with reference to the contract and undertaking of Armstrong to pay for services, the court will sustain the motion of defendant for a peremptory instruction to the jury to return a verdict for the administrator.

Judgment reversed for proceedings consistent with this opinion.